IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| JAY COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-814-WKW |
| | ) | [WO] |
| ALABAMA STATE | ) | |
| UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jay Coleman brings this action against his former employer, Alabama State University ("ASU"), alleging gender-based disparate pay and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. He also brings a state law claim against ASU's president and the members of ASU's board of trustees in their official capacities for equitable relief, asserting that these Defendants improperly delegated their power to terminate employees. Before the court is Defendants' motion for summary judgment (Doc. # 33). Plaintiff filed a response to which Defendants replied. (Docs. # 37, 45.) Based upon careful consideration of the arguments of counsel, the relevant law, and the record as a whole, Defendants' motion for summary judgment is due to be granted on the federal law claims, and supplemental jurisdiction is due to be declined on the state law claim.

# I.  JURISDICTION AND VENUE

Subject matter jurisdiction is exercised pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), 42 U.S.C. § 2000e–5(f)(3), and 28 U.S.C. § 1367.  The parties do not contest personal jurisdiction or venue, and the court finds that there are allegations sufficient to support both.

# II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (*per curiam*); Fed. R. Civ. P. 56(a).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.

If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish, with evidence beyond the pleadings, that a genuine issue material to each of its claims for relief exists.  Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 324; *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  What is material is determined by the substantive law applicable to the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (*per curiam*) (internal quotation marks and citation omitted).

A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263; *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  However, if the evidence on which the nonmoving party relies "is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50 (citations omitted).  "A mere 'scintilla' of evidence supporting the [nonmovant's] position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party," *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990), and the nonmoving

party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (*per curiam*). Hence, when a plaintiff fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

On summary judgment, the facts must be viewed in the light most favorable to the non-movant. *See Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002). Hence, "the 'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case.'" *Id.* (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 925 n.3 (11th Cir. 2000)).

### III.  FACTUAL AND PROCEDURAL BACKGROUND

The employer is Alabama State University. ASU's president is William H. Harris, and its board of trustees has nine members. The employee is Jay Coleman.

Mr. Coleman began his employment with ASU in 2004 as an assistant technical operations manager.  His starting salary of $33,638 was at the top of the range for the advertised position. Mr. Coleman's primary job responsibilities were to ensure that the production lighting, audio, video, and stage layout systems were properly designed and maintained in the Acadome, a multipurpose academic and physical-education facility on ASU's campus.  Mr. Coleman also assumed direct responsibility for all facility productions systems in the technical operations manager's absence.

When Mr. Coleman initially was hired, his department provided services only to the ASU Acadome.  That changed during the 2009–2010 fiscal year.  The department was renamed the Facilities Department and its services were expanded to all buildings on ASU's campus.  After the reorganization, the Facilities Department consisted of nine employees:  (1) Facilities Director Gina Jobe Ishman; (2) Assistant Facilities Director Don Perry; (3) Technical Operations Manager John Martin; (4) Mr. Coleman;  (5) Crew Chief Leonard Burk;  (6) Events Coordinator Yunice Emir; (7) Director of Housekeeping Betty Sims; (8) Senior Secretary Jennifer Williams; and (9) Administrative Secretary Crystal Jackson.   Ms. Ishman was in charge of the Facilities Department.  She directly supervised Mr. Martin, who in turn was Mr. Coleman's immediate supervisor.

Although the responsibilities of the Facilities Department increased, the employees' pay did not. Needless to say, employee morale and performance suffered as a result. Ms. Ishman sought to remedy the perceived pay inequity by requesting a reclassification of the jobs in the Facilities Department, which would have permitted pay increases, but after a third party's independent evaluation, Ms. Ishman's request was denied. The increased volume of work continued, therefore, without any corresponding increase in pay and was a topic of concern raised during several staff meetings.

At the staff meetings, Mr. Coleman frequently vocalized his displeasure with the additional job duties. In particular, on October 21, 2010, Ms. Isham met with her staff to discuss various departmental issues, including her concern about the lack of coverage for after-hours and weekend events. Responding to Ms. Ishman's request for employee feedback, Mr. Coleman reported that he did not want to work events after hours or on weekends. He also repeated his concern that the Facilities Department staff was not being compensated adequately for the workload increase. He questioned why the department staff was expected "to do more work campus wide . . . without being compensated accordingly." (Pl.'s Dep. 79; *see also* Ishman's Dep. 48–49 (providing that Mr. Coleman vocalized his opinion that the Facilities Department's employees warranted additional pay for working events outside the

Acadome).)  Continuing in his protest, Mr. Coleman also complained that a year earlier, he was required to assume Mr. Martin's job responsibilities without additional compensation while Mr. Martin was on medical leave.  (Ishman's Dep. 79–80; Ishman's Aff. ¶ 12.)  He compared himself with Ms. Emir, who in early 2009 received extra pay for serving in Ms. Ishman's stead while Ms. Ishman was on maternity leave. (Ishman's Dep. 79–80; *see also* Williams's Dep. 26 (testifying that Mr. Coleman expressed his dissatisfaction with Ms. Emir's interim appointment as facilities director while Ms. Ishman was on maternity leave).)  Mr. Coleman also complained during that meeting that Ms. Ishman had received an increase in pay, but that he had not.  (Williams's Dep. 26.)

Ms. Isham perceived that Mr. Coleman's tone during the October 21 meeting was disrespectful, elevated, and unprofessional.  (Ishman's Dep. 49–50; Ishman's Aff. ¶ 5; *see also* Jackson's Dep. 27–29 (describing Mr. Coleman's tone as "loud").) Additionally, at one point during the meeting when Mr. Martin attempted to interject, Mr. Coleman put his hand in Mr. Martin's face.  (Ishman's Aff. ¶ 5.)  As a consequence, Ms. Ishman issued Mr. Coleman a written formal reprimand the same date for his "unprofessional conduct" during the October 21 meeting.  (Formal Reprimand (Def.'s Ex. 10).)  She wrote, "Your recent incident, in my opinion, displays your lack of cooperation and unwillingness to correct your conduct and

performance.  For instance, you have raised your voice, refused to follow instructions, and put your hand in your supervisors [sic] face."  (Formal Reprimand 2.)  In the formal reprimand, Ms. Ishman also cited prior instances concerning Mr. Coleman's alleged unruly comments, unprofessional conduct, insubordination, and his complaints about working at events occurring after hours and on weekends.  (Formal Reprimand 2.)  After consultation with Carmen Douglas, the vice president for human resources, Ms. Ishman increased the discipline to a suspension.  On November 8, 2010, Ms. Isham provided written notification to Mr. Coleman of her recommendation to suspend him for five days without pay on grounds of "insubordination and disrespect to . . . supervisors" during the October 21 meeting.  (Not. of Suspension (Pl.'s Ex. 13).)  Notwithstanding a letter from Mr. Coleman's attorney protesting the discipline, the recommendation was approved by ASU's president on November 17, 2010.  (Nov. 17, 2010 Mem. (Pl.'s Ex. 15).)

After his five-day suspension, Mr. Coleman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), dated January 31, 2011.  In his EEOC charge, Mr. Coleman alleged that ASU discriminated against him on the basis of his gender by paying him less than "females in similar situations." (Jan. 2011 EEOC Charge (Defs.' Ex. 33).)  He also contended that Ms. Ishman issued him the formal reprimand and five-day suspension in retaliation for his complaints

during the October 21 meeting about perceived gender-based disparate pay.  (Jan. 2011 EEOC Charge.)

A week later, on February 8, 2011, Mr. Coleman filed an internal grievance with Ms. Ishman, alleging that Mr. Martin made "false, vicious and malicious statements" against him.  (Pl.'s Grievance Against Martin.)  Specifically, Mr. Coleman alleged that on a day when Mr. Coleman was on leave, Mr. Martin falsely accused him of calling the fire marshal to the Acadome.  Ms. Ishman investigated the grievance, found it unsubstantiated, and documented her findings in a letter addressed to Mr. Coleman and dated February 21, 2011.  Mr. Coleman did not receive the letter, however.  (Pl.'s Dep. 94.)  Mr. Coleman contends in this litigation that Ms. Ishman simply ignored his grievance as further punishment for his oral complaints about gender-based pay disparities.

According to Mr. Coleman, Ms. Ishman continued to treat him with contempt. Specifically, he refers to his March 2, 2011 request for a lateral transfer from his position in the Facilities Department to the position of academic advisor in ASU's Department of Education.  (Pl.'s Lateral Transfer Request (Defs.' Ex. 21).)  At that time, Ms. Ishman told Mr. Coleman that she did not oppose his transfer request. (Ishman's Dep. 43.)  It is undisputed, however, that Mr. Coleman was not transferred to the position he requested.  Mr. Coleman contends that, notwithstanding Ms.

Ishman's initial affirmation, he never heard another word about his transfer request from Ms. Ishman.   Mr. Coleman characterizes Ms. Ishman's inaction as a continuation of her attempts to punish him for his having complained to her about what he perceived to be discriminatory salaries between him and female employees.

Mr. Coleman maintains that Ms. Ishman's hostilities against him culminated in her recommending his termination on July 19, 2011.  The following is an account of what occurred four days preceding Ms. Ishman's recommendation.  On July 15, 2011, Mr. Coleman went to ASU's facilities office to check his box, and ran into Mr. Martin in the office.  Also present were Ms. Jackson and Ms. Williams.  Mr. Martin reminded Mr. Coleman of an orientation event scheduled at ASU on Sunday.  Mr. Coleman, in turn, reminded Mr. Martin that he [Mr. Coleman] served as a part-time preacher.  He informed Mr. Martin that he was scheduled to officiate an out-of-town funeral and that he would not rush back for the ASU event.  Mr. Martin then accused Mr. Coleman of allowing his minister duties to take precedence over his job responsibilities.  Agitated by Mr. Martin's remark, Mr. Coleman retorted twice to Mr. Martin, "I will go to jail for you."  (Martin's Dep. 41.)  Mr. Coleman walked out of the office at which time Mr. Martin audibly muttered to Ms. Jackson, "[T]hat sounded like a threat to me."  (Martin's Dep. 42.)  Mr. Coleman suddenly reappeared, walked up to Mr. Martin, pointed his index finger at Mr. Martin's nose, and said in a raised

voice, "[L]et me tell you what[;] that was not a threat[;] that was a promise." (Martin's Dep. 45.)  Mr. Coleman walked out of the office again, but just before exiting said to Mr. Martin, "I am not your boy."[1]  (Martin's Dep. 46.)

Mr. Martin memorialized this event in a memorandum to Ms. Ishman, dated July 15, 2011.  In that memo, Mr. Martin concluded:

> From the tone of this incident, and Mr. Coleman's use of the phrase, "I will go to jail for you," I was left with the impression that he was threatening me with some type of assault or physical attack that would result in criminal charges for himself, such as felonious assault or something more severe.

(Martin's Letter (Defs.' Ex. 23).)  Ms. Isham and Danielle Kennedy-Lamar, the vice president for university relations, met with Mr. Coleman after receiving Mr. Martin's memo.  During the meeting, Mr. Coleman admitted making the alleged statements to Mr. Martin.  (Ishman's Aff. ¶ 17.)

On July 19, 2011, Ms. Ishman wrote a letter to Ms. Douglas, requesting Mr. Coleman's termination based upon Mr. Coleman's threatening statements to Mr. Martin and past instances of unprofessional and insubordinate conduct.  (Ishman's

---

[1] Mr. Coleman's brief relies principally on Mr. Martin's deposition for the account of this episode.  (*See* Pl.'s Summ. J. Resp. 18−19 (Doc. # 37).)  Mr. Coleman has not denied that the oral exchange transpired between him and Mr. Martin.  He appears to deny, however, that his remarks were intimidating.  (*See, e.g.*, Report of Findings and Recommendations of H'rg Officer 1 (noting that "[w]hile Mr. Coleman did not view his behavior as intimidating[,] he did characterize himself as being 'hot' and 'mad'" during his exchange with Mr. Martin on July 15, 2011).)

Aff. ¶ 17.)  Mr. Coleman contested the recommendation and consequently received a hearing.  The hearing officer found that the evidence substantiated the charge against Mr. Coleman of threatening and intimidating a co-employee and recommended Mr. Coleman's termination pursuant to Section 6.1.1 of ASU's Human Resources Policies and Procedures Manual.  On August 24, 2011, President Harris approved Mr. Coleman's termination.

On September 27, 2011, Mr. Coleman filed a second EEOC charge, alleging that his termination was in retaliation for filing his earlier EEOC Charge.  (Sept. 2011 EEOC Charge (Defs.' Ex. 35).)  The next day, Mr. Coleman, acting *pro se*, filed this lawsuit against ASU, alleging Title VII gender-based disparate pay and retaliation claims.  After obtaining counsel, Mr. Coleman amended his complaint on January 30, 2012, to add a state law claim against ASU's president and the members of ASU's board of trustees in their official capacities.[2]

The Amended Complaint sets forth three Title VII counts against ASU.  Count I alleges that ASU discriminated against Mr. Coleman by paying similarly-situated female employees higher wages than he was paid.  Count II alleges that ASU retaliated against Mr. Coleman by disciplining, suspending, and terminating him in retaliation for his oral complaints to Ms. Ishman, about alleged unlawful pay

---

[2]  On March 29, 2012, the board voted to ratify the termination of Mr. Coleman.

discrimination.  Count II alleges that ASU fired Mr. Coleman in retaliation for filing

an EEOC charge against ASU on January 31, 2011.  Counts II and III also incorporate

allegations that Mr. Coleman's firing was the culmination of a pattern of retaliatory

acts, including ASU's failure to take any action in response to his request for a lateral

transfer and his internal grievance against Mr. Martin.  (Am. Compl. ¶ 17.)  He

further adds that his termination was in retaliation for his being identified on June 3,

2011, as a potential witness in a sexual harassment lawsuit against ASU that was

pending in this district at that time.  *See Weatherly v. Ala. State Univ.*, No. 10cv192-

WKW (M.D. Ala., filed Mar. 4, 2010).  The Amended Complaint also includes a state

law claim (Count IV) against ASU's president and the members of ASU's board of

trustees seeking a declaratory judgment and writ of mandamus for violations of state

law in the administration of ASU's policies.[3]

---

[3] The board of trustees at the time of Mr. Coleman's termination consisted of Elton Dean, Oscar Crawley, Bobby Junkins, Taylor Hodge, Buford Crutcher, Thomas Figures, Lawrence Lemak, Marvin Wiggins, and Herbert Young.

## IV.  DISCUSSION

Defendants move for summary judgment on Mr. Coleman's Title VII and state law claims.  Part A addresses Mr. Coleman's Title VII claims against ASU.  Part B discusses Mr. Coleman's supplemental state law claim against ASU's president and the members of ASU's board of trustees.

### A.     <u>Federal Law Claims (Title VII)</u>

Mr. Coleman brings gender-based disparate pay and retaliation claims against ASU pursuant to Title VII, 42 U.S.C. §§ 2000e–2(a)(1) and 2000e–3(a).  Title VII prohibits discrimination in employment on the basis of sex.  § 2000e–2(a)(1).  It also prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." § 2000e–3(a).

Because Mr. Coleman does not present direct evidence of discrimination or retaliation, his Title VII claims are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Crawford v. Carroll*, 529 F.3d 961, 975 (11th Cir. 2008).  First, under *McDonnell Douglas*, a plaintiff must create an inference of discrimination or retaliation by establishing a *prima facie* case.  If the plaintiff establishes a *prima facie* case, the burden shifts to

14

the defendant to present a legitimate, nondiscriminatory or non-retaliatory reason for the employment action.  If the defendant succeeds, the burden shifts back to the plaintiff to demonstrate that the asserted reason was a pretext for discrimination or retaliation.  *Crawford*, 529 F.3d at 975–76.  The pretext analysis "requires the court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory [or non-retaliatory] reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'"  *Id.* at 976 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

### 1.    *Disparate Pay*

To establish a *prima facie* case of discriminatory pay, a plaintiff must show that he or she "occupies a position similar to that of a higher paid employee who is not a member of [his or] her protected class." *Crawford*, 529 F.3d at 975 (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994)).  "In a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him." *Cooper v. S. Co.*, 390 F.3d 695, 735–36 (11th Cir. 2004) (quotation marks, citation, and emphasis omitted), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S.

454, 457 (2006). "A comparator is an employee similarly situated to the plaintiff in all relevant respects." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1280 (11th Cir. 2008) (internal quotations and alteration omitted).

Mr. Coleman fails to establish a *prima facie* case of gender-based disparate pay because none of the five possible comparators whom he has identified – Ms. Kennedy, Ms. Ishman, Ms. Emir, Ms. Jackson, and Ms. Williams – is similarly situated to him. Ms. Kennedy, the vice president for university relations, worked in an entirely different academic department in an entirely different managerial position. Ms. Ishman was Mr. Coleman's supervisor in a director-level position, with different job-related characteristics. Ms. Jackson and Ms. Williams served in administrative secretarial positions, whereas Mr. Coleman worked as an assistant technical operations manager. These four proffered comparators did not hold jobs similar to Mr. Coleman's or occupy positions with job-related characteristics similar to Mr. Coleman's. Hence, any assertion that these employees' compensation was not directly commensurate with Mr. Coleman's compensation does not create an inference of gender-based pay discrimination.

As to Ms. Emir, Mr. Coleman does not argue that as the events coordinator, she performed similar job functions as he did . Rather, his contention focuses on the time period during which Ms. Emir undisputedly received a pay increase for performing

16

Ms. Ishman's job in an interim appointment while Ms. Ishman was on maternity leave.  He argues that Ms. Emir was in a similar situation as he because she assumed her supervisor's responsibilities just as he assumed his supervisor's (Mr. Martin) job duties when his supervisor took medical leave.  The only difference between the two, according to Mr. Coleman, is that Ms. Emir received additional pay during that time period, and Mr. Coleman did not.

ASU argues that the factor that distinguishes Ms. Emir's situation from Mr. Coleman's is that Ms. Emir assumed Ms. Ishman's duties under an interim appointment for which Mr. Coleman was not eligible when he performed Mr. Martin's duties.  ASU submits evidence that Ms. Emir's then-existing position as events coordinator did not require her to perform the duties of the facilities director in the facilities director's absence, thus, qualifying Ms. Emir for an interim appointment.  (Ishman's Dep. 80.)

Mr. Coleman does not dispute Ms. Emir's eligibility for an interim appointment.  As to his situation, Mr. Coleman worked as Mr. Martin's assistant, and his job description provided that he was to perform technical operations in Mr. Martin's absence.  (*See, e.g.*, Job Description ("When the Operations Manager is not present, [the assistant technical operations manager] assumes direct responsibility for all facility productions systems." (Defs.' Ex. 3)).)  Because Mr. Coleman does not

17

submit evidence suggesting that he was eligible for an interim appointment when he assumed Mr. Martin's job duties in Mr. Martin's absence, Ms. Emir is not a proper comparator.[4]

The failure of Mr. Coleman to identify a suitable comparator and the absence of any "other evidence of discrimination," *Rioux*, 520 F.3d at 1277, are fatal to his *prima facie* case. Mr. Coleman is left only with his belief that he feels that ASU discriminated against him, but "his opinion, without more, is not enough to establish a prima facie case of [gender-based pay] discrimination" *Holifield*, 115 F.3d at 1564. Summary judgment is appropriate, therefore, on Mr. Coleman's disparate pay claim because he cannot establish that ASU treated similarly situated employees outside of his class more favorably in terms of pay.[5]

---

[4] ASU also cites its Policies and Procedures Manual that governs the formula for paying an employee who is placed in an interim appointment position. (ASU's Manual 2.7.2 (Defs.' Ex. 20).) Mr. Coleman does not dispute that Ms. Emir was paid in accordance with ASU's policy with respect to interim appointments.

[5] Because Mr. Coleman fails to establish a *prima facie* case, it is unnecessary to reach the pretext stage. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181–82 (11th Cir. 2010) (noting that pretext becomes a relevant issue only after the plaintiff has established a *prima facie* case). It is notable, however, that much of Mr. Coleman's pretext argument is based upon broad, unsupported assertions that he otherwise was denied promotional opportunities because ASU awarded the better paying jobs to females in his department without posting and without requiring interviews. Mr. Coleman cites no evidence, for example, to support his argument that ASU appointed Ms. Ishman as the facilities director in 2008 without any competitive or application process. (*See* Pl.'s Summ. J. Resp. 30; Defs.' Reply 5 (Doc. # 45).) Mr. Coleman cannot raise a genuine issue of material fact based upon an unsupported argument in a brief. To the extent that Mr. Coleman also is seeking to raise independent gender discrimination claims based upon alleged denial of promotional opportunities (Pl.'s Summ. J. Resp. 31–32), these claims are not alleged in his Amended Complaint, and the law is well established that "[a]

## 2.     Retaliation

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that "(1) [he or] she engaged in an activity protected under Title VII; (2) [he or] she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Crawford*, 529 F.3d at 970.

### a.     Mr. Coleman's Statements Made During the October 21, 2010 Staff Meeting

Mr. Coleman contends that ASU issued him a formal reprimand on October 21, 2010, and a five-day suspension on November 8, 2010, in retaliation for his complaining to Ms. Ishman during the October 21 staff meeting about perceived inequities in pay he believed were attributable to gender.  With respect to the *prima facie* case, ASU does not challenge that a formal reprimand and five-day suspension are adverse employment actions or that a causal connection exists between these disciplinary measures and the alleged protected conduct.  Accordingly, for purposes of the summary judgment analysis, the court presumes that Mr. Coleman satisfies the second and third elements of his retaliation *prima facie* case.

---

plaintiff may not amend h[is] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004).

ASU contends, however, that the *prima facie* case fails on the first element. It argues that Mr. Coleman did not engage in protected conduct first, because the increased workload was shared by all employees in the department, males and females alike, and second, because Mr. Coleman did not hold a reasonable, good faith belief that ASU had engaged in an unlawful practice.

To demonstrate a *prima facie* case of retaliation, a plaintiff does not have to prove that the employer practice under protest was actually unlawful " so long as [he or] she had a reasonable good faith belief that the discrimination existed." *Meeks*, 15 F.3d at 1021. The court need not weigh in on whether Mr. Coleman's held a reasonable, good faith belief that ASU had engaged in unlawful gender-based wage discrimination. Even if it is assumed that Mr. Coleman engaged in statutorily protected activity, summary judgment is nonetheless appropriate for ASU. Accordingly, the court proceeds directly to whether ASU's stated reason for issuing Mr. Coleman a formal reprimand and a five-day suspension was a pretext for unlawful retaliation.

ASU has proffered a legitimate, non-retaliatory reason for both adverse employment actions by asserting that the punishment was imposed based upon Mr. Coleman's perceived unprofessional and disrespectful conduct toward his superiors during the October 21 meeting. Indeed, Mr. Coleman has not denied that he spoke

in a loud voice or that he put his hand in Mr. Martin's face during the October 21 meeting. Because ASU satisfies its burden, Mr. Coleman can avoid summary judgment only by demonstrating that the proffered reason is not the actual reason, but instead was a pretext for retaliation.

Mr. Coleman argues that temporal proximity alone should sustain a finding of pretext. (Pl.'s Summ. J. Resp. 34, 38.) It is true that temporal proximity can be sufficient to establish a *prima facie* case of retaliation. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). The court is unaware of any authority establishing, however, that where the *prima facie* case has been successfully rebutted, the temporal closeness between the protected activity and the adverse action is sufficient on its own to sustain a pretext finding. The case upon which Mr. Coleman relies does not say what he claims it says. In fact, it says the opposite. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 656 (5th Cir. 2004) ("Without more than timing allegations, and based on [the employer's] legitimate, nondiscriminatory reason . . . , summary judgment in favor of [the employer] was proper" on the employee's retaliation claim). With respect to Mr. Coleman's argument that pretext is established based upon what he deems as ASU's continuous retaliation against him, the fallacy of that argument is addressed in the next section of this opinion.

21

**b.     Mr. Coleman's EEOC Charge Filed on January 31, 2011**

Mr. Coleman also alleges that Ms. Ishman recommended his termination on July 19, 2011, in retaliation for his having filed an EEOC charge against ASU on January 31, 2011.  ASU argues that Mr. Coleman cannot show a causal connection between the filing of his EEOC charge and his termination.

Where there is evidence that the decision maker was aware of the protected conduct, a "'close temporal proximity' between the protected expression and [the] adverse action is sufficient circumstantial evidence of a causal connection for purposes of a prima facie case."  *Higdon*, 393 F.3d at 1220 (quoting *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)).  Absent any other evidence of causation, however, "'mere temporal proximity between . . . knowledge of protected activity and an adverse . . . action . . . must be very close."  *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  "Even a three-month interval between the protected expression and the employment action . . . is too long."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010); *Higdon*, 393 F.2d at 1220 (holding that, by itself, three months was insufficient to prove causation).

Here, the filing of Mr. Coleman's EEOC charge on January 31, 2011, preceded his termination notice by five-and-a-half months.  Under Eleventh Circuit case law,

22

a five-and-a-half-month temporal gap between Mr. Coleman's protected activity and his discharge is too protracted to give rise to a presumption of a retaliatory motive on the part of ASU in firing Mr. Coleman. Moreover, Ms. Ishman attests that she did not become aware that Mr. Coleman had filed "anything with the EEOC" until after this lawsuit was filed (Ishman's Aff. ¶ 19), a contention that Mr. Coleman does not challenge on summary judgment.

Presumably to shorten that temporal gap and demonstrate the required causal connection, Mr. Coleman points out that he was fired less than a month after he received his right-to-sue letter from the EEOC. (Doc. # 37, at 35, 38.) Mr. Coleman cites no authority and presents no argument that would permit him to create a new starting point for measuring the temporal gap based upon the date he received his right-to-sue letter, and there are sound reasons why his argument cannot prevail. First, the Supreme Court has rejected the suggestion that an employee's receipt of a right-to-sue letter qualifies as a protected activity. In *Clark County School District*, the Supreme Court characterized as "utterly implausible" the respondent's "suggestion that the EEOC's issuance of a right-to-sue letter – an action in which the employee takes no part – is a protected activity of the employee." 532 U.S. at 273. The protected activity – the activity that required action on Mr. Coleman's part – was Mr. Coleman's filing of his EEOC charge. Second, there is no indication that Ms.

23

Ishman was aware of the right-to-sue letter when she recommended his termination. The only evidence establishes that she was not aware of it at that time.[6]  On this record, and absent any further argument from Mr. Coleman, the date of filing (*i.e.*, January 31, 2011) remains the pertinent starting date for measuring the temporal gap. An inference of causation cannot be drawn, therefore, based on the temporal proximity between the issuance of the right-to-sue letter and Ms. Ishman's termination recommendation.

For the same reason, the causal connection cannot be resurrected based upon Mr. Coleman's contention that on June 3, 2011, he was identified as a potential witness in a then-pending discrimination lawsuit in this district, *see Weatherly v. Ala. State Univ.*, No. 10cv192-WKW (M.D. Ala., filed Mar. 4, 2010), and six weeks later notified of his termination.  He provides no evidence or even argument that he played any role in his disclosure as a potential witness.  Similarly, because there is no evidence indicating how that disclosure occurred, there are no facts from which it can

---

[6] It is notable that, although not a premise advanced by Mr. Coleman, the Supreme Court in *Clark County School District* also rejected the appeals court's suggestion that the employer first received knowledge of the plaintiff's EEOC charge when it became aware of the right-to-sue letter and that, therefore, it was inferrable that "the transfer proposal made three months later was [the employer's] reaction to the charge."  532 U.S. at 273.

be inferred that he played a part in that disclosure.[7]  The June 3 disclosure deadline is not a qualifying protected activity, and Mr. Coleman cannot chalk the temporal starting line for his *prima facie* case causation argument at June 3, 2011.

Mr. Coleman makes a final attempt to hurdle the *prima facie* case, but this attempt also falls short.  He argues that he was subjected to a series of adverse acts immediately after the October 21, 2010 meeting, and that these continuous acts, considered collectively, demonstrate the causal link.  The Eleventh Circuit has recognized, *albeit* in an unpublished opinion, that a plaintiff may establish the causal connection required to state a *prima facie* Title VII retaliation case where "a series

---

[7] The Amended Complaint includes an allegation that "[o]n June 3, 2011, Coleman was identified in another Alabama State Title VII pending case as a possible witness."  (Am. Compl. ¶ 7.)  In his deposition, Mr. Coleman clarified that this other case was the *Weatherly* action.  In the portions of his deposition upon which Mr. Coleman relies to oppose summary judgment (Doc. # 37, at 17 ¶ 29), however, there is no explanation as to how on June 3, 2011 "it was discovered that [Mr. Coleman] could be a potential witness" in the *Weatherly* case or who made the discovery.  (Pl.'s Dep. 171.)  As ASU points out in its reply brief, Mr. Coleman was disclosed as a potential witness for the plaintiffs in the *Weatherly* action on a witness list filed in that case on September 30, 2011, which was more than two months after Mr. Coleman's notice of termination.  Moreover, Mr. Coleman testified during his deposition that he was asked to testify in the *Weatherly* case about his alleged retaliatory termination from ASU's employment, which again would mean that his involvement in the *Weatherly* action occurred after his termination.  (Defs.' Reply 7–8.)  ASU points out that an employer cannot retaliate against an employee within the meaning of Title VII if the protected conduct occurred *after* the employer took adverse action against the employee.  At the very least, the evidence indicating that Mr. Coleman's termination preceded the adverse employment action suggests a disconnect in Mr. Coleman's argument.  Given the court's finding that on this record the third-party disclosure of Mr. Coleman as a potential witness in *Weatherly* is not protected conduct by which to gauge the temporal closeness, it need not be resolved which party bears the evidentiary fault at the summary judgment stage for the sketchy details as to how and to whom the disclosure was made on June 3.

of adverse employment acts commenced almost immediately" after the known protected activity. *Jones v. Fulton Cnty., Ga.*, 446 Fed. App'x 187, 191 (11th Cir. 2011). Under this formulation, however, these retaliatory acts "must be material (or substantial) to be considered." *Id.* at 192 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66–68 (2006)). Here, the retaliatory acts about which Mr. Coleman complains including the failure of Ms. Ishman to respond both to his internal grievance against Mr. Martin and to his request for a lateral transfer. These are not sufficiently substantial such that Ms. Ishman's inaction on both matters "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. Additionally, Mr. Coleman does not refute ASU's evidence that Mr. Coleman would not have met the criteria for a lateral transfer. (Douglas's Aff. ¶ 98 (Doc. # 34-7).)

In sum, Mr. Coleman has not presented any evidence of causation. He fails, therefore, to establish a *prima facie* case of retaliation under Title VII.

Even it were assumed that Mr. Coleman satisfied his *prima facie* case, his claim nonetheless would fail. ASU presents a legitimate, non-retaliatory reason for Mr. Coleman's termination by relying on Mr. Coleman's threatening remarks and behavior toward Mr. Martin. *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 770 (11th Cir. 2005) ("So long as the employer articulates 'a clear and reasonably

specific' non-discriminatory basis for its actions, it has discharged its burden of production" to articulate a non-discriminatory reason for its employment action) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)).

Mr. Coleman attempts to raise a genuine issue of material fact as to pretext by arguing that ASU failed to adhere to the progressive disciplinary guidelines in Section 6.1.1 of ASU's Human Resources Policies and Procedures Manual.  ASU argues that the disciplinary guidelines in Section 6.1.1 cannot serve as a basis for demonstrating pretext based upon their discretionary nature.

The Eleventh Circuit has indicated that circumstances may exist where an employee can establish pretext by demonstrating an employer's failure to follow a progressive discipline policy in his or her case.  *See Ritchie v. Indus. Steel, Inc.*, 426 Fed. App'x 867, 873 (11th Cir. 2011); *see also Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985) ("Departures from normal procedures may be suggestive of discrimination."). An employer's failure to follow that policy, however, does not show pretext "if management has discretion as to whether to follow the discipline policy." *Ritchie*, 426 Fed. App'x at 873; *see also Mitchell v. USBI Co.* 186 F.3d 1352, 1355–56 (11th Cir. 1999) ("Standing alone, deviation from a company policy does not demonstrate discriminatory animus.").

Here, Section 6.1.1 includes a chart listing "disciplinary guidelines" for certain offenses and provides that a reprimand is the rule of thumb for a first offense for "[t]hreatening, intimidating, coercing, or interfering with another student or employee." (Manual, § 6.1.1 (Pl.'s Ex. 21).)  These guidelines reflect recommended, not mandatory, punishments.  Specifically, the introductory paragraph of Section 6.1.1 provides that "[a]ll disciplinary action will be considered on a case by case basis.  When warranted by the facts, discipline up to and including termination may be imposed for a first offense."  (Manual, § 6.1.1.)  Given the discretion afforded ASU in implementing discipline under Section 6.1.1, any deviation from the recommended guidelines does not constitute evidence of pretext.  Mr. Coleman also presents no other basis for showing that ASU's alleged deviation from its disciplinary policy occurred in a retaliatory manner.  He introduces no evidence, for instance, indicating that ASU implemented its disciplinary policies differently in a case where an employee who had not filed an EEOC charge had engaged in similar misconduct as Mr. Coleman.  *See Rojas v. Florida*, 285 F.3d 1339, 1344 & n.4 (11th Cir. 2002).

Finally, Mr. Coleman points out that Ms. Ishman did not witness the incident for which she sought Mr. Coleman's termination. The pretext point he is trying to make by this assertion is unclear.  Mr. Coleman presents no evidence that calls into question Ms. Ishman's sincere belief that the incident occurred in the manner reported

28

by Mr. Martin. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (holding that the employee failed to show pretext by presenting evidence that he did not engage in the misconduct because there was no evidence that the employer's belief that he committed the misconduct "was unworthy of credence"). All told, Mr. Coleman urges the court "to do nothing more than second-guess a business decision made by [his employer]." *Rojas*, 285 F.3d at 1344. That this court cannot do. *See id.* (Examination of "whether a business decision is wise or nice or accurate" is not permitted under Title VII.).

In sum, ASU's asserted legitimate, non-retaliatory reason for Mr. Coleman's termination stands unscathed by any pretext evidence. ASU is entitled to summary judgment on Mr. Coleman's retaliatory termination claim.

## B.   Supplemental State Law Claim

Because ASU is entitled to summary judgment on all federal law claims, the court in its discretion declines supplemental jurisdiction over the remaining state law claim. *See* 28 U.S.C. § 1367(c)(3); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial."). Defendants' motion for summary judgment on the state-law claims, therefore, is due

to be denied as moot, and the state law claims are due to be dismissed without prejudice. *See* § 1367(d).

## V.  CONCLUSION

Based on the foregoing, it is ORDERED that Defendants' motion for summary judgment (Doc. # 33) is GRANTED on Plaintiff's Title VII claims against Defendant Alabama State University.

It is further ORDERED that Defendants' motion for summary judgment (Doc. # 33) is DENIED as moot on Plaintiff's state law claim, and that the state law claim is DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

It is further ORDERED that Defendants' Motion for Leave to File Supplement to Reply Brief (Doc. # 46) is DENIED as moot.

An appropriate judgment will be entered separately.

DONE this 24th day of October, 2012.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE